## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JAMES E. DONOVAN**,

      Plaintiff,

vs.                                                    No. CIV 06-1097 MCA/KBM

**PHELPS DODGE CHINO, INC.**,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on *Defendant's Motion for Summary Judgment* [Doc. 28], filed September 4, 2007, and *Defendant's Motion for Summary Judgment on Plaintiff's Punitive Damages Claims* [Doc. 37], filed October 25, 2007. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants *Defendant's Motion for Summary Judgment* with respect to Counts II and III as asserted in the *First Amended Complaint* and declines to exercise supplemental jurisdiction over the state-law claim asserted in Count IV.[1] The Court denies as moot *Defendant's Motion for Summary Judgment on Plaintiff's Punitive Damages Claims*.

## I. BACKGROUND

Plaintiff James Donovan is a former employee of Defendant Phelps Dodge Chino, Inc. ("Phelps Dodge"), having worked for Phelps Dodge from 1979 until his termination on

---

[1] Count I was dismissed by stipulation of the parties. [<u>See</u> Doc. 19].

October 6, 2005. [Doc. 5 at 2]. According to Mr. Donovan, during his 26 years with Phelps Dodge he worked in a variety of positions and "performed his job duties and responsibilities in a more than satisfactory manner." [Id.]. Complaints against Mr. Donovan began to surface, however, once he was made EMS (Emergency Service) Coordinator in July 2005. [See id.].

On August 26, 2005, Mr. Donovan sent the following e-mail message to co-worker Patricia Potter:

> Hi there. I don't want either of us to get in trouble, but I want your information. I would like your Dob, expiration date on your emt lic., I like goofing around, dr.lic#& expiration date, your chest size, can I call your cell, what your certs are as far as hazmat confined space, etc. delete.

[Doc. 29; Exh. E-1, Aug. 26, 2005 e-mail from J.E. Donovan to Trish S. Potter (hereinafter "the August 26th e-mail")]. On September 28, 2005, Ms. Potter showed the e-mail to co-worker Lillian Medina, Phelps Dodge's Health and Safety Specialist, and then to her manager, Ned Hall. Ms. Potter also "remembered" two occasions on which Mr. Donovan hugged her, which she did not like. These two incidents occurred not later than May 2004 and, according to Ms. Potter, during one of them, Mr. Donovan played with her hair for "[j]ust a few seconds" and then pressed his hand against the side of her breast. [Doc. 36; Exh. 6, April 11, 2007 depo. of Patricia S. Potter at 17-21; see also Doc. 29; Exh. E-2, Sept. 30, 2005 statement of Patricia Potter].

Ms. Potter is an EMT and, through her deposition, testified that prior to August 26, 2005, she had had conversations with Mr. Donovan, in his capacity as EMS Coordinator,

about becoming involved as an EMT in the EMS program. [Doc. 36; Exh. 6, Potter depo. at 25].  Mr. Donovan also testified through his deposition as to what he meant in his e-mail message.  According to him, when he stated, "*I don't want either of us to get in trouble*," he was referring to conversations he had had with Ms. Potter in which she implied that her supervisor did not want her to join the EMS program because her involvement would likely interfere with her job duties.  Mr. Donovan also explained that when he said, "*I like goofing around,*" he meant that members of the EMS program tell jokes, have fun, and do not take all matters entirely seriously.  When asked why he would include that statement in his e-mail, he responded, "*Because I think, at one point in a conversation, that [Ms. Potter] had asked me, you know, Are we always real serious about everything when we do our trainings, and all that stuff? And I just wanted to make her—aware that we goof around, too*." [Doc. 29; Exh. A, April 12, 2007 depo. of James Donovan at 68].  He explained that he had asked for chest size for purposes of supplying t-shirts, jackets, and rope-rescue harnesses. [Id.; Donovan depo. at 68].  In any event, Ms. Potter testified that, while she considered the reference to chest size and the caution that Mr. Donovan did not want either of them to get into trouble to be "inappropriate . . . for work[,]" she told nobody about the e-mail until September 28, 2005.  She instead made the decision to stay away from Mr. Donovan and not respond to any e-mails from him.  [Doc. 36; Exh. 6, Potter depo. at 9-10].

After she read Mr. Donovan's e-mail and heard Ms. Potter's concerns as to its propriety, Ms. Medina decided to lodge a complaint with Mr. Donovan's supervisor, Ed Valentine, because, in addition to the e-mail, Ms. Medina remembered co-worker Ruth Fox

telling her that in or about July of 2005, Mr. Donovan had hugged her (Ms. Fox) and, in the course of doing so, pressed his arms against her breast. [Doc. 36; Exh. 2, April 11, 2007 depo. of Lillian Medina at 15-19, 62-63].   Although Ms. Medina did not inform Mr. Valentine of the incident involving Ruth Fox when it happened, she felt, after the sending of the August 26th e-mail, that "by that time we had had enough, that we needed to do something . . . ."   [Id.; Medina depo. at 63].

When Ms. Medina told Mr. Valentine of her concerns, he called Human Resources ("HR") Generalist Eva Hernandez to set up a meeting for the next day. [Doc. 29; Exh. E-4, Oct. 5, 2005 statement of Lillian Medina].   It was also during her conversation with Mr. Valentine that Ms. Medina

> told Ed that since things are coming out in the open with JD [Mr. Donovan] I told him that I had encountered some very uncomfortable behavior as well but that it wasn't hugging.  I told Ed that the first week I had JD move into the office next to mine was when mine started.  I would call JD to look at some EMS program on the computer, something he would have to work on for the EMS program.  The first time he came to look at a program he leaned so close in back of me that with my elbows in the typing position, my left elbow contacted his genital area, so I moved my elbow forward and I moved to the side to avoid contact.  I really didn't think anything about it.
>
> The second time he did it again and I moved and got to wondering about it, is he doing it intentionally? The third time I called him I knew it wasn't just a coincidence he pressed himself forward to make the contact. . . .

[Id.; Medina statement].  This alleged conduct occurred in August of 2005. [Doc. 36; Exh. 2, Medina depo. at 80].

4

The specifics of any meeting involving Mr. Valentine, Ms. Medina, and Ms. Hernandez are unclear from the record; however, "as a result of the [August 26th] email," HR Manager Grace Munoz instructed Ms. Hernandez and Larry Green (also an HR Generalist) to conduct an investigation. [Doc. 29; Exh. E; Affidavit of Grace Munoz]. During the investigation, Ms. Potter, Ms. Fox, Ms. Medina, and Amanda Wilmes[2] were interviewed and provided statements in which each one recounted at least one occasion during which they believed Mr. Donovan had touched a breast (Ms. Potter and Ms. Wilmes); caused contact with Mr. Donovan's crotch area (Ms. Medina); or engaged in "a full body press, especially [with] the chest," (Ms. Fox). [Id.; Exh. E-2 to E-5]. Each of the women reported feeling uncomfortable, except for Ms. Wilmes. Ms. Wilmes, however, explained that she did not report her incident because she feared endangering her job. [See id.].

On or about October 2 or 3, 2005, Ms. Hernandez and Mr. Green met with Mr. Donovan. [Doc. 36; Exh. 3, April 11, 2007 depo. of Eva Hernandez at 21]. Ms. Hernandez asked Mr. Donovan to write a statement, but she did not show him a copy of the August 26th e-mail, which was the basis of her knowledge of the allegations against him. [Id.; Hernandez depo. at 21-22]. At the time of this meeting, Ms. Hernandez did not have copies of the written statements of Ms. Medina and Ms. Fox. [Id.; Hernandez depo. at 21-26]. At her deposition, all Ms. Hernandez could recall telling Mr. Donovan with respect to the allegations against him was "[t]hat there were women who had complained about being

---

[2] Amanda Wilmes's statement is dated "10-6-05[,] 16:40." However, by October 6, 2005, Mr. Donovan had already been placed on suspension and, in fact, was terminated that day, effective 4:00 pm. [See Doc. 29; Exh. B; Hernandez depo. at 84].

inappropriately touched, unwelcomed touches." [Id., Hernandez depo. at 26]. Ms. Hernandez did not reveal the names of the women to Mr. Donovan. [Id.]. With respect to the contents of the August 26th e-mail, Ms. Hernandez testified that she informed Mr. Donovan "[t]hat there was an E-mail that he had generated inappropriately in regards to a female body part." [Id.; Hernandez depo. at 33]. Ms. Hernandez testified that she did not ask Mr. Donovan either why his e-mail included a reference to Ms. Potter's chest size or why he wrote "*delete*" at the end. She also testified that she did not know whether anyone from Phelps Dodge's HR department asked Mr. Donovan for an explanation as to the contents of the August 26th e-mail. [Id.; Hernandez depo. at 35]. In a statement addressed to the HR Department and dated October 3, 2005, Mr. Donovan wrote, in pertinent part, "*I was told that I sent an e-mail that was inappropriate. It was stated that there is a copy so I cannot deny it. I don't know in what context it was sent . . . .*" [Doc. 29; Exh. G; Statement of JD Donovan]. On or about October 3, 2005, Ed Valentine suspended Mr. Donovan from employment pending an investigation. [Doc. 36; Exh. 5, April 13, 2007 depo. of Edward Valentine at 82].

Although Ed Valentine was Mr. Donovan's supervisor, Mr. Valentine testified through his deposition that he did not conduct any of the investigation into the allegations against Mr. Donovan. He also testified that he did not read any of the statements taken from Mr. Donovan's accusers. Instead, Mr. Valentine relied on Ms. Hernandez's belief that what Ms. Potter, Ms. Fox, and Ms. Medina had reported was true, and that Mr. Donovan did not deny sending the August 26th e-mail. [Doc. 36; Exh. 5, Valentine depo. at 57-60]. He explained why he believed his reliance on Ms. Hernandez's investigation was sufficient:

6

> A:      Well, in the case we're talking about, sexual harassment,
>         we've got a situation where we had people that are on the
>         other side that, to protect their identity, et cetera, you
>         don't necessarily get a chance at a full and fair trial, or
>         whatever you want to call it. I mean, it's just not—
>
> Q:      Who told you that?
>
> A:      What do you mean, who told me that?
>
> Q:      That's my question.  Who told you that, that in the course
>         of a sexual harassment investigation, that it's not
>         necessary to reveal to the accused harasser, who's
>         bringing the allegations forward?
>
> A:      I don't think anybody told me that.  It's a question of,
>         you've got to balance—as a management issue, you've
>         got to balance the individuals who are on the one side
>         and the individual on the other.  You've got to make a
>         choice about what the best way to go is.

[Id., Valentine depo. at 63-64].

According to HR Manager Grace Munoz, she, Larry Green, and Eva Hernandez then met and decided that Mr. Donovan should be terminated.  Through her deposition, Ms. Munoz confirmed that, before his termination, Mr. Donovan (1) was not shown a copy of the August 26th e-mail (although it was "described" to him); (2) was not shown the written statements of Ms. Potter, Ms. Fox, or Ms. Medina; and (3) could not recall the context of the August 26th e-mail and did not know the specifics of the charges against him.[3]  [Doc. 36; Exh. 4, June 14, 2007 depo. of Grace Munoz at 26-28].   Ms. Munoz also testified that nowhere in Phelps Dodge's "Code of Ethics" or "Guiding Principles" does it say that an individual who lodges a sexual-harassment complaint will be given anonymity. [Id., Munoz

---

[3]  The question of the fairness or unfairness of the manner in which the investigation was conducted is more properly considered in the context of the determination of the merits of Mr. Donovan's breach-of-implied-employment-contract claim, Count IV, over which this Court declines to exercise supplemental jurisdiction, as more fully explained in Section II.C. below.

depo. at 35-36].   Nor did she ever discuss with anybody at Phelps Dodge whether Mr. Donovan should be allowed to see the statements and the August 26th e-mail and make a response prior to being terminated. [Id., Munoz depo. at 53-54].   Nevertheless, Ms. Munoz believes that the investigation into the allegations against Mr. Donovan was complete, thorough, impartial, and fair. [Id., Munoz depo. at 28].   Accordingly, a recommendation to terminate Mr. Donovan was presented to Ed Valentine, who decided to terminate Mr. Donovan on the basis of the allegations against him. [Id., Munoz depo. at 58-60].

On October 6, 2005, Mr. Donovan, Mr. Valentine, and Ms. Hernandez convened for a meeting that, to Ms. Hernandez's recollection, lasted not more than five minutes. [Doc. 36; Exh. 3, Hernandez depo. at 86].   Mr. Donovan was handed a letter of the same date, authored by Eva Hernandez.   The letter stated:

> On October 3, 2005 you were suspended from your duties pending an investigation alleging sexual harassment.
>
> Three (3) separate allegations were raised by female employees of New Mexico Phelps Dodge Mining Company.   After a thorough investigation was conducted, it was determined that there was a pattern of unprofessional behavior of a sexual nature to include unwelcome touching.
>
> During the investigation it was further discovered that you inappropriately used the email system to comment about an individual's body parts and requested that the email be deleted once read.
>
> In your position as EMS Coordinator and an acting agent of company, this behavior is unacceptable.   Therefore, effective immediately your employment is terminated.

[Doc. 29; Exh. C, Oct. 6, 2005 letter of Eva Hernandez].   In short, Mr. Donovan was

terminated for having violated Phelps Dodge's policy against sexual harassment.[4] [Doc. 29;

Exh. E, Munoz affidavit at 2, ¶ 10].

After Mr. Donovan was terminated, Ms. Medina assumed his job responsibilities.

However, Ms. Medina testified that, as Phelps Dodge's Health and Safety Specialist, those

responsibilities had been assigned to her *before* Mr. Donovan was made EMS Coordinator.

In Ms. Medina's words, "*I had them before, and I just assumed them after.*" [Doc. 36; Exh.

2, Medina depo. at 30].  She explained:

> The position [of EMS Coordinator] had been open—had been
> open for a long time.  When we went down in 2000, we had less
> employees.  Those were duties that were assigned to me, the
> EMS Coordinator, Safety, you know, Hygiene, because of the
> mine employees that we had in the company.  When we came
> back up, of course, all these other things were picking up, so we

---

[4]  In addition to explaining the circumstances under which "[s]exual advances, requests
for sexual favors, and other verbal or physical conduct of a sexual nature by anyone constitute
sexual harassment," Phelps Dodge's policy on "Freedom from Discrimination, Harassment and
Other Abusive Situations" provides:

Sexually harassing conduct in the workplace is prohibited.  Such conduct may include
but is not limited to:

- unwelcome flirtations, touching, advances or propositions of a sexual nature:
- verbal abuse of a sexual nature;
- graphic or sexually suggestive verbal or written comments about an individual's dress
or body which an individual finds offensive;
- sexually degrading words to describe an individual;
- the display in the workplace of sexually suggestive objects or pictures, including
inappropriate photographs;
- inappropriate use of electronic images/messages.

[Doc. 29; Exh. E; "Guiding Principles" at IV-6 to IV-7].

> needed some help, so that's when we put that job up *to—we*
> *opened that job to get some—to get me some help, in other*
> *words.*

[Id. at 31 (emphasis added)].  Ms Medina testified that she did not receive an increase in pay

when she re-assumed the duties in question, nor did her job title change. [Id. at 30].

On November 29, 2006, Mr. Donovan filed *Plaintiff's First Amended Complaint for*

*Damages from Age Discrimination, Sex Discrimination, and Breaches of an Implied*

*Contract of Employment* pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e, *et seq.;* the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C.

§ 621, *et seq.*; and New Mexico common law. [Doc. 5].  On May 14, 2007, the parties

stipulated to the with-prejudice dismissal of Mr. Donovan's ADEA claim (Count I).  [Doc.

19].  With respect to his Title VII claim of gender discrimination (Count II), Mr. Donovan

asserts, in pertinent part, the following:

> 37. Donovan is male.
>
> 38. [Phelps Dodge] has no legitimate, nondiscriminatory
> business reasons for terminating Donovan on the basis of false
> charges of sexual harassment. Any reason [Phelps Dodge] may
> put forth is but a pretext for discrimination.
>
> 39. Donovan did not participate in any conduct that was severe
> and pervasive and caused any reasonable woman to believe she
> was being subjected to sexual harassment.
>
> 40. Donovan, because he was such an exemplary employee,
> could only be subject to termination if PD targeted him because
> of his sex, male, for these outlandish and incredible charges.
>
> 41. [Phelps Dodge] violated the provisions of Title VII in
> discriminating against Donovan because he is a male–falsely

accusing him of sexual harassment for the purpose of terminating his employment.

[Doc. 5 at 5-6].  Mr. Donovan also maintains, in Count III, that

[t]he fact that Donovan is male was a motivating factor in Defendant treating Donovan in a discriminatory manner with respect to the terms and conditions of his employment, including, but not limited to, the unjust termination[, and that] Defendant would not have taken the adverse employment actions described hereinabove against Donovan in the absence of the impermissible motivating factor that Donovan is male.

[Id. at 6].

Phelps Dodge has moved for summary judgment, arguing, among other things, that Mr. Donovan cannot establish a prima facie case for gender discrimination and that, even if he could, he has not shown that the decision to terminate him was pretextual. [See generally Doc. 29].  Mr. Donovan responds that (1) the refusal to allow him to respond to the charges against him; (2) the failure to advise him of the nature of those charges; (3) Ms. Hernandez's alleged "short circuiting" of the investigation based on the fact that she believed Mr. Donovan's accusers, among other things, all "point to disparate treatment based on sex." [Doc. 36 at 23].  According to Mr. Donovan, he "make[s] out a prima facie case of sex discrimination based [o]n the fact that he, as a male, was afforded treatment so far removed from the deference given females that [Phelps Dodge] chose to completely deprive [him] of any opportunities to respond to the false allegations." [Id. at 22-23].  He also submits that "[i]t would not be far-fetched at all to maintain that Donovan is a member of a group, males, who have become historically disfavored with respect to allegations of workplace sexual

11

harassment." [Id. at 21].

## II. ANALYSIS

### A. Summary Judgment Standard, Fed.R.Civ.P. 56

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed.R.Civ.P. 56(e). Nor will unsupported conclusory allegations create a genuine issue of fact. Harrison v. Wahatoyas, L.L.C., 253 F.3d 552, 557 (10th Cir. 2001). Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Judgment is appropriate as a matter of law if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial). See Celotex, 477 U.S. at 324. It is not the Court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the Court

assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

### B. Title VII, 42 U.S.C. § 2000e, *et seq.*

Title VII makes it unlawful for an employer to, among other things, "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."  42 U.S.C. § 2000e-2(a)(1).  The plaintiff in a Title VII action carries the initial burden of establishing a prima facie case of gender discrimination.  If the plaintiff does so, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  If the employer satisfies its burden, the plaintiff must then demonstrate that the legitimate reason is merely a pretext for gender discrimination.  Argo v. Blue Cross and Blue Shield of Kansas, Inc., 452 F.3d 1193, 1201 (10th Cir. 2006).

To establish a prima facie case, a plaintiff ordinarily must show that "the plaintiff (1) belongs to some protected class, (2) was qualified for the position or benefit at issue, (3) suffered an adverse employment action, and (4) was treated less favorably than others (e.g., the position at issue remained open after the adverse employment action)."  Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1134 (10th Cir. 2004).  The demonstration of such a

13

prima facie case "raises an inference of discrimination only because [courts] presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Furnco Const. Corp. v. Waters, 438 U.S. 567, 577 (1978). Indeed, "[f]or most plaintiffs, establishing a prima facie case is perfunctory, and liability turns on whether the defendant's stated explanation for the adverse employment action is pretextual." Argo, 452 F.3d at 1201.

In a reverse-discrimination case, however, the McDonnell Douglas presumption that is valid when a plaintiff belongs to a disfavored group—that unless otherwise explained, discrimination is more likely than not the reason for the challenged decision—is not necessarily justified when the plaintiff is a member of an historically favored group. Notari v. Denver Water Dept., 971 F.2d 585, 589 (10th Cir. 1992). For that reason, a reverse-discrimination plaintiff seeking to obtain the benefit of the McDonnell Douglas presumption "must, in lieu of showing that he belongs to a protected group, establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." Id. "Alternatively, a plaintiff may produce facts 'sufficient to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred.'" Argo, 452 F.3d at 1202 (*quoting* Notari, 971 F.2d at 590.

In this case, Mr. Donovan contends that he "make[s] out a prima facie case of sex discrimination based [o]n the fact that he, as a male, was afforded treatment so far removed from the deference given females that [Phelps Dodge] chose to completely deprive [him] of

any opportunities to respond to the false allegations." [Doc. 36 at 22-23]. He characterizes the investigation into the charges against him as "a biased acceptance of any allegation brought forward by these females and a dogged determination to exclude [him] from participating in any aspect of the investigation[,]" [id. at 24], and further describes the entire matter as one of "she said—he was never allowed to say[.]" [Id. at 28].

Mr. Donovan has offered no authority in support of his position that a prima facie case of gender discrimination results from a defendant/employer's alleged decision to accept at face value sexual-harassment accusations brought by female coworkers against a male plaintiff/employee without allowing that male employee to respond to the charges. In fact, case law supports the opposite conclusion, as is evident from Jones v. Intermountain Power Project, wherein the Tenth Circuit affirmed the decision of the district court not to submit the male plaintiff's Title VII claim to the jury, having "determined that [he] failed both as a matter of law and as a matter of fact to establish a Title VII violation." Jones v. Intermountain Power Project, 794 F.2d 546, 549 (10th Cir. 1986) (*overruled on other grounds by* Yellow Freight Sys., Inc. v. Donnelly, 494 U.S. 820 (1990)). In Jones, a newspaper reporter informed the plaintiff's supervisor that she had heard that the plaintiff was sexually harassing female employees. The supervisor interviewed the accusing parties and concluded that the allegations were true. The supervisor *did not* speak to the plaintiff regarding the allegations; instead, he relayed his findings to his employer, which instructed him to investigate further. When further investigation substantiated the supervisor's findings, the plaintiff was terminated. Id. at 548.

The Tenth Circuit agreed with the district court's determination that the plaintiff had failed to make out a prima facie case of discrimination.  The Circuit explained:

> In essence, [the plaintiff] attempts with [his Title VII] claim to convert a borderline sexual harassment case against himself into a sexual discrimination case against Black & Veatch and IPA because their "concerns about the females' accusations far outweighed any desire to treat [him] fairly" and "because of the one-sided investigation, not just the termination which resulted." We agree with the trial court that [the plaintiff's] Title VII claim is insufficient both as a matter of law and as a matter of fact.  In addition to failing to make out a prima facie case of discrimination, there was a rational, nondiscriminatory reason for [the plaintiff's] discharge. There was no showing that such reason was pretextual. [The plaintiff] was not replaced by a female; and there was no evidence indicating that, under the same circumstances, a female would have been treated any differently than was [the plaintiff].

Jones, 794 F.2d at 555.

Although Mr. Donovan sets out the correct burden that a member of a protected class must overcome to demonstrate a prima facie case of gender discrimination, he has neither shown background circumstances to support the inference that Phelps Dodge is "one of those unusual employers who discriminates against the majority[,]" nor produced facts "sufficient to support a reasonable inference that but for [his] status the challenged decision would not have occurred."  Notari, 971 F.2d at 589, 590.  While Ms. Medina confirmed that she took over Mr. Donovan's job duties and responsibilities after his termination, the Court determines this fact to be of limited significance given that the duties and responsibilities of the EMS Coordinator belonged to Ms. Medina before Mr. Donovan was hired for that position and she simply re-assumed them after Mr. Donovan's discharge.  She also testified

that she received no pay increase as a result and that her job title did not change. [Doc. 36; Exh. 2; Medina depo. at 30-31].

Mr. Donovan appears next to suggest that he is not required to meet the more stringent standard that the Tenth Circuit applies in reverse-discrimination cases when he asserts that "[f]ollowing a thorough review of Tenth Circuit case law on the issue, Donovan has been unable to find any case that authorizes the use of a 'reverse discrimination' heightened showing on a prima facie case of sex discrimination where the termination is based on alleged false allegations of sexual harassment[,]" and that "[i]t would not be far-fetched at all to maintain that Donovan is a member of a group, males, who have become historically disfavored with respect to allegations of workplace sexual harassment."  [Doc. 36 at 21]. Again, Mr. Donovan has offered nothing in support of either proposition, the first of which this Court reads as suggesting that the applicability of the heightened prima-facie showing depends on the nature of the underlying conduct resulting in the adverse employment action, as opposed to the plaintiff's membership in an historically favored group.  To the contrary, in Mattioda v. White, the Tenth Circuit expressly reaffirmed Notari, in which the Circuit, recognizing that  "instances of reverse discrimination are less common . . . modified the requirements of a prima facie case *to reflect a plaintiff's membership in a[n] historically favored group*."  Mattioda v. White, 323 F.3d 1288, 1292 (10th Cir. 2003) (emphasis added) ("Notari continues to operate as Tenth Circuit precedent and, under Notari, [a reverse-discrimination plaintiff] must demonstrate background circumstances that support an inference of the [defendant's] discrimination against [the majority group of which the

17

plaintiff is a member] he proceeds under the <u>McDonnell Douglas</u> framework."). Because Mr. Donovan has not shown that Phelps Dodge is one of those unusual employers that discriminates against the majority, and there is nothing in the record to support a reasonable inference that Mr. Donovan was suspended and then discharged because he is male, summary judgment will be entered for Phelps Dodge on Mr. Donovan's Title VII claim.

### C. State-Law Claim for Breach of Implied Contract

In Count IV, Mr. Donovan alleges that Phelps Dodge's personnel policies and procedures created an implied contract of employment, which Phelps Dodge breached "by failing to follow its disciplinary procedures in terminating Donovan, failing to conduct a fair, thorough, and reasonable investigation, and failing to advise Donovan of the charges against him and the evidence supporting the allegations, among other things." [Doc. 5 at 7]. Phelps Dodge responds, in pertinent part, that Mr. Donovan was an at-will employee and, as such, could be terminated at any time and for any or no reason. [Doc. 29 at 14-19].

Section 1367 of Title 28 of the United States Code provides, in pertinent part, that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ." 28 U.S.C. § 1367(a). Pursuant to subsection (c), however, the Court may decline to exercise its supplemental jurisdiction if, among other things, it has dismissed all claims over which it had original jurisdiction. 28 U.S.C. § 1367(c)(3). In other words, once "the bases for federal subject matter jurisdiction have been extinguished[,] the district court may decline

to exercise continuing 'pendent or supplemental jurisdiction over [the] plaintiff's state claims." Lancaster v. Indep. Sch. Dist. No. 5, 149 F.3d 1228, 1236 (10th Cir. 1998) (dismissing without prejudice plaintiff's claims for, *inter alia*, breach of contract after having entered summary for defendant on plaintiff's First and Fourteenth Amendment claims); see also Taylor v. Meacham, 82 F.3d 1556, 1564 n.1 (10th Cir. 1996) ("Once a federal court dismisses claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over related state law claims.").

In the instant action, the entry of summary judgment in favor of Phelps Dodge on Mr. Donovan's Title VII claim extinguishes the basis for federal subject matter jurisdiction. See Lancaster, 149 F.3d at 1236. Accordingly, the Court declines to exercise its supplemental jurisdiction over the breach-of-contract claim. See 28 U.S.C. § 1367(c)(3). In so declining, the Court has considered whether the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction. See Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 541 (10th Cir. 1995). The Court is not convinced that these factors weigh in favor of retaining jurisdiction. The employment policies that are the subject of Mr. Donovan's breach-of-contract claim derive from state law and, therefore, are best suited to adjudication in a state court. Notions of comity and federalism demand that a state court try such claims in the first instance, absent compelling reasons to the contrary. See Thatcher Enters. v. Cache County Corp., 902 F.2d 1472, 1478 (10th Cir. 1990). In addition, the Court's decision not to exercise supplemental jurisdiction is not necessarily fatal to Mr. Donovan's state-law claim, as 28 U.S.C. § 1367(d) may

19

provide for the tolling of any limitations period regarding this claim.  For these reasons, Mr.

Donovan's claim for breach of his employment contract will be dismissed without prejudice.

See Lancaster, 149 F.3d at 1236 (where district court had entered summary judgment for

defendant on plaintiff's federal claims, affirming district court's decision to dismiss without

prejudice plaintiff's state-law claims).

## III. CONCLUSION

As more fully set forth above, Mr. Donovan has failed to demonstrate a prima facie

case of reverse gender discrimination.  Accordingly, summary judgment will be entered for

Phelps Dodge on Mr. Donovan's Title VII claim.  Because the entry of summary judgment

in favor of Phelps Dodge on Mr. Donovan's Title VII claim extinguishes the basis for federal

subject matter jurisdiction, the Court declines to exercise its supplemental jurisdiction over

Mr. Donovan's state-law contract claim.  Finally, the Court denies as moot Defendant's

motion for summary judgment regarding punitive damages.

**IT IS, THEREFORE, ORDERED** that *Defendant's Motion for Summary Judgment*

[Doc. 28] is **GRANTED** as to Counts II and III of the *First Amended Complaint*;

**IT IS FURTHER ORDERED** that Count II of the *First Amended Complaint* is

**DISMISSED WITH PREJUDICE**;

**IT IS FURTHER ORDERED** that Count III of the *First Amended Complaint* is

**DISMISSED WITH PREJUDICE**;

**IT IS FURTHER ORDERED** that Count IV of the *First Amended Complaint* is

**DISMISSED WITHOUT PREJUDICE**;

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment on Plaintiff's Punitive Damages Claims* [Doc. 37] is **DENIED AS MOOT**;

**IT IS FURTHER ORDERED** that the **PRETRIAL CONFERENCE** set for TUESDAY, April 1, 2008, at 9:00 a.m., the **CALL OF THE CALENDAR** set for THURSDAY, May 8, 2006, at 9:00 a.m., and the **JURY SELECTION/TRIAL** set for MONDAY, May 12, 2008, at 9:00 a.m. are hereby **VACATED**.

**SO ORDERED** this 11th day of February, 2008, in Albuquerque, New Mexico.

_____

**M. CHRISTINA ARMIJO**
United States District Judge